UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| RICHARD GORMAN, JR., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | SA-22-CV-1071-FB (HJB) |
| | § | |
| PENNYMAC LOAN SERVICES, LLC, | § | |
| | § | |
| Defendant. | § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

**To the Honorable United States District Judge Fred Biery:**

This Report and Recommendation concerns the Motion for Summary Judgment (Docket Entry 63) filed by Defendant Pennymac Loan Service, LLC ("Pennymac"). Pretrial matters have been referred to the undersigned for consideration. (Docket Entry 80.) For the reasons set out below, I recommend that Defendant's motion (Docket Entry 63) be **GRANTED**.

**I.      Jurisdiction.**

The Court has jurisdiction over this case for alleged violations of the federal Fair Credit Reporting Act ("FCRA") pursuant to 28 U.S.C. § 1331. I have authority to issue this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1).

**II.     Background.**

On August 31, 2017, Plaintiff look out a loan secured by a deed of trust, to purchase real property in San Antonio, Texas. (Docket Entry 63-3, at 1.) Plaintiff defaulted on the loan on July 1, 2019, after failing to make his monthly mortgage payment. (Docket Entry 63-2, at 8, 11.) On September 20, 2019, Pennymac approved Plaintiff for a Special Forbearance Plan (henceforth "Pennymac Plan"). (Docket Entry 63-2, at 26.)

Although Plaintiff's outstanding past-due balance for the months of July and August 2019 was $5,054.93, the Pennymac Plan required Plaintiff only to make a $5 payment on the first of the month for the next six months, beginning on October 1, 2019. (Docket Entry 63-2, at 26.) The terms of the Pennymac Plan warned Plaintiff that "[d]uring the term of the Plan" from October 1, 2019 until April 1, 2019, he would "remain delinquent" on his mortgage and Pennymac would "continue to report the delinquency status" to credit reporting agencies ("CRAs"). (Docket Entry 63-2, at 27.) The Pennymac Plan also explained to Plaintiff that Pennymac's "acceptance and posting of any payment during the Plan does not . . . cure any default under [the] loan, unless the payments are sufficient to completely cure [his] entire default under [the] loan." (*Id.*) And the Pennymac Plan also warned Plaintiff that should he default on any of its terms, "Penny[m]ac may terminate [the] Plan and . . . institute or resume foreclosure." (*Id.*)

According to Pennymac's records, Plaintiff made his $5 Pennymac Plan payments for the months of October and November, but failed to continue making those payments in December or January. (Docket Entry 63-1, at 16–18, 22, 37–38; 63-2, at 27, 55.) Pennymac terminated the Pennymac Plan on February 6, 2020. (Docket Entry 63-1, at 39.) On March 5, 2020, Pennymac notified Plaintiff that it had accelerated the loan and scheduled the property for a foreclosure sale on May 5, 2020. (Docket Entry 63-1, at 41–49.)

On April 27, 2020, Plaintiff requested another forbearance from Pennymac, this time pursuant to the recently-enacted Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"); Pennymac approved forbearance (henceforth "CARES Forbearance") the next day. (Docket Entry 63-1, at 10; Docket Entry 63-2, at 18, 41.) In its notice approving the CARES Forbearance, Pennymac reminded Plaintiff that his loan payment remained due for the July 1, 2019, and explained that, under the CARES Act, it must continue to "report [his] loan as delinquent on a

forbearance plan if [his] loan was past due" as of January 31, 2020.  (Docket Entry 63-2, at 41.)[1]

Plaintiff was not required to make any payments during the CARES Forbearance, which was

scheduled to end on June 30, 2020, unless extended.  (*Id.*)  The CARES Forbearance was ultimately

extended until September 31, 2021.  (Docket Entry 63-2, at 51.)

On July 26, 2021, Plaintiff sold the property and used the proceeds to pay off the full loan

balance of $243,714.62, which Pennymac credited to his account the next day.  (Docket Entry 63-

1, at 31; Docket Entry 63-2, at 20–21, 51.)  On August 6, 2021, Pennymac reported to the various

CRAs that Plaintiff's account status was "65"—a code number which, according to industry

standards for credit reporting, means "Paid in full[;] [a] foreclosure was started."  (Docket Entry

63-1, at 6–9, 52–66.)[2]  Pennymac also reported his payment rating as code "6"—meaning the

account was "180 or more days past due" when it was closed—identifying the date of his first

delinquency as "7/31/2019."  (Docket Entry 63-1, at 53–54, 56, 58.)[3]

---

[1] The CARES Act amended the FCRA to provide that, "beginning on January 31, 2020 and ending . . . 120 days after the date on which the national emergency concerning the . . . [COVID-19] outbreak declared by the President on March 13, 2020 . . . terminates"—which officially occurred on April 10, 2023, making August 8, 2023 the official end date, *see National Emergencies Act*, PL 118-3, April 10, 2023, 137 Stat 6 ("[T]he national emergency declared by . . . the President on March 13, 2020 . . . is hereby terminated.")—"if a furnisher makes an accommodation with respect to [one] or more payments on a credit obligation or account of a consumer, and the consumer makes the payments or is not required to make [one] or more payments pursuant to the accommodation, the furnisher shall . . . report the credit obligation or account as current," unless the consumer's "credit obligation or account was delinquent before the accommodation," in which case the furnisher must "maintain the delinquent status during the period in which the accommodation is in effect." 15 U.S.C. § 1681s-2(a)(1)(F)(i)(II), (ii)(I)–(II)(aa).

[2] Code 65 means that a foreclosure process began but the account was closed before it was ever completed. By contrast, Code 94 means "Foreclosure completed; there may be a balance due." (Docket Entry 63-1, at 64–65.)

[3] These codes are defined in the Credit Reporting Resource Guide, developed by the Consumer Data Industry Association ("CDIA"). (*See* Docket Entry 63-1, at 60–67.)

Plaintiff disputed this information to several CRAs, which in turn notified Pennymac of the disputes by sending it Automated Credit Dispute Verification ("ACDV") forms.  (Docket Entry 63-1, at 6–9, 52–59.)   In July and August of 2022, Pennymac investigated the disputes by reviewing its records, then corrected some information while verifying other information.  (Docket Entry 63-1, at 6–7, 9, 52–59; Docket Entry 63-2, at 48, 50, 68–69.)  For instance, where CRAs reported that Plaintiff's account status was a "13"—meaning it was "[p]aid or closed" with "zero balance"—Pennymac corrected that information to reflect that Plaintiff's account status was a "65"—also meaning that the account was paid in full, but with the wrinkle that a foreclosure had begun (but not finished) at one time or another.  (Docket Entry 63-1, at 55, 64.)  Further, where CRAs reported that Plaintiff's first delinquency began on July 1, 2019, Pennymac corrected that information to reflect that the date of his first delinquency was July 31, 2019.  (Docket Entry 63-1, at 58.)  And where CRAs reported that Plaintiff's payment rating was a "4"—meaning his account was past due by 120–149 days during the reporting period prior to its being paid off—Pennymac corrected that information to reflect that his payment rating was, in fact, a "6"—meaning that his account was actually 180 days or more past due during the reporting period prior to its being paid off.  (*Id.* at 52, 57, 62.)

Plaintiff filed suit on September 22, 2022.  (Docket Entry 1.)  After more than a year of discovery, Pennymac now moves for summary judgment.  (Docket Entry 63.)  Plaintiff has responded to the motion (Docket Entry 64), Pennymac has replied (Docket Entry 68), and Plaintiff has filed a sur-reply (Docket Entry 69).

III.    **Summary Judgment Standard.**

The purpose of summary judgment is "to isolate and dispose of factually unsupported claims or defenses." *Hayes v. Locke Supply Co.*, 724 F. Supp. 3d 609, 612 (E.D. Tex. 2024) (citing

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).  Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A disputed fact is material when it "might affect the outcome of the [claim or defense] under the governing law."  *Allen v. U.S. Postal Serv.*, 63 F.4th 292, 300 (5th Cir. 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Allen*, 63 F.4th at 300 (quoting *Anderson*, 477 U.S. at 248).  The genuineness of a dispute is viewed "through the prism of the substantive evidentiary burden, . . . . bear[ing] in mind the actual quantum and quality of proof necessary to support liability."  *Anderson*, 477 U.S. at 254.

The moving party "always bears the initial burden of informing the . . . court of the basis for its motion and identifying the record evidence which it believes demonstrates the absence of a genuine issue of material fact."  *Martin v. Petty*, 699 F. Supp. 3d 547, 555 (S.D. Tex. 2023) (Rosenthal, J.) (quoting *Celotex*, 477 U.S. at 323) (citation modified).  "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response."  *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 512 (5th Cir. 2014) (quoting *Kee v. City of Rowlett, Tex.*, 247 F.3d 206, 210 (5th Cir. 2001)).  When the nonmovant bears the burden of proof at trial, as in this case, the moving party "may merely point to the absence of evidence and thereby shift to the nonmovant the burden of demonstrating by competent summary judgment proof that there is a dispute of material fact warranting trial."  *Martin*, 699 F. Supp. 3d at 555 (quoting *MDK S.R.L. v. Proplant Inc.*, 25 F.4th 360, 368 (5th Cir. 2022)) (citation modified).

If the movant meets its burden, "the nonmovant must come forward with specific facts showing a genuine factual issue for trial."  *Martin*, 699 F. Supp. 3d at 555 (quoting *Houston v. Tex.*

*Dep't of Agric.*, 17 F.4th 576, 581 (5th Cir. 2021)) (citation modified). The nonmovant "must identify specific evidence in the record and articulate the precise manner in which the evidence aids their case." *Martin*, 699 F. Supp. 3d at 555 (quoting *Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 453 (5th Cir. 2021)) (citation modified). The nonmovant "cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Martin*, 699 F. Supp. 3d at 555 (quoting *Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 368 (5th Cir. 2021)) (citation modified).

The Court need only consider the parties' cited materials. FED. R. CIV. P. 56(c)(3). "[I]t is not the trial court's obligation to sift through the record in search of evidence to support a party's claims; instead, it is the party's burden to identify specific evidence in the record, and to articulate the precise manner in which that evidence support[s] its claim." *Diamond Servs. Corp. v. RLB Contracting, Inc.*, 113 F.4th 430, 443 (5th Cir. 2024) (citation modified); *see Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir. 1988) (holding that deposition "was never made part of the competent summary judgment record" because nonmovant "failed to designate, or in any way refer to, the deposition as the source of [its] factual support").

When considering a motion for summary judgment, the Court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Instead, "facts that are subject to genuine dispute are viewed in the light most favorable to [the nonmovant]," *Guillot on behalf of T.A.G. v. Russell*, 59 F.4th 743, 749–50 (5th Cir. 2023), and the Court "construe[s] all reasonable inferences in [the nonmovant's] favor," *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021).

## IV.    Discussion.

Pennymac seeks summary judgment on two grounds.  First, it argues that Plaintiff's claims for violations of  § 1681s-2(b)(1) are actually claims for reporting inaccurate information in violation of § 1681s-2(a)(1)(F)(ii)(I).  (Docket Entry 63, at 2, 11.)  Because consumers do not have private remedies available for a violation of § 1681s-2(a), Pennymac contends that Plaintiff's claims fail as a matter of law.  (*Id.*)  Second, Pennymac argues that, even if Plaintiff has a cause of action under the statute, there is no genuine dispute that it reported accurate information and otherwise conducted a reasonable investigation.  (*Id.* at 3, 11.)  This Report and Recommendation addresses each argument in turn.

### A.  *Whether Plaintiff Has a Cause of Action.*

Pennymac correctly argues that a private plaintiff has no cause of action against a furnisher of information, like Pennymac, for reporting inaccurate information to CRAs.  *See* 15 U.S.C. § 1681s-2(d)  ("[S]ubsection (a) . . . shall be enforced exclusively . . . by [governmental officials].");  *id.* § 1681s-2(a) ("A person shall not furnish any information relating to a consumer to any [CRA] if the person knows or has reasonable cause to believe that the information is inaccurate.");  *Shaunfield v. Experian Info. Sols., Inc.*, 991 F. Supp. 2d 786, 805 n.20 (N.D. Tex. 2014) ("[A] consumer does not have any remedies available for a claimed violation of § 1681s-2(a).").  But Plaintiff's claims are not that Pennymac provided inaccurate information in violation of § 1681s-2(a).  Rather, his claims are that Pennymac failed to discover certain inaccuracies by conducting a reasonable investigation and consequently failed to correct those inaccuracies, in violation of § 1681s-2(b)(1).  (Docket Entry 64, at 17.)

Courts have explained that, if a CRA notifies a furnisher that a consumer has disputed certain reported information, "the furnisher must review all relevant information provided by the

CRA, conduct an investigation, report the results of the investigation, and modify . . . delete . . . or . . . permanently block the reporting of inaccurate or incomplete information." *Jett v. Am. Home Mortg. Serv., Inc.*, 614 F. App'x 711, 713 (5th Cir. 2015) (citation modified); *see Givens-Murray v. Equifax Info. Servs., LLC*, No. 3:19-cv-2651-M, 2021 WL 6774687, at *2 (N.D. Tex. Jan. 12, 2021); *Ostiguy v. Equifax Info. Servs., LLC*, No. 5:16-CV-790-DAE, 2017 WL 1842947, at *5 (W.D. Tex. May 4, 2017), *aff'd*, 738 F. App'x. 281 (5th Cir. 2018).  And nothing in § 1681s-2 explicitly "precludes a private right of action for violation of the investigation and reporting requirements of [§] 1681s-2(b).  *Young v. Equifax Credit Info. Servs., Inc.*, 294 F.3d 631, 639 (5th Cir. 2002).  To the contrary, "many federal courts in the Fifth Circuit have held that . . . § 1681s-2(b) creates a private right of action."  *Shaunfield*, 991 F. Supp. 2d at 805 n.20.

Although "consumers cannot sue furnishers for providing inaccurate information—only for conducting unreasonable investigations," *Milgram v. Chase Bank USA*, N.A., 72 F.4th 1212, 1218 (11th Cir. 2023), the mere fact that a § 1681s-2(b)(1) claim is predicated in part on a furnisher's having reported inaccurate information to a CRA does not automatically convert it into a disguised § 1681s-2(a) claim—after all, a plaintiff cannot prevail on a § 1681s-2(b)(1) claim without identifying "actual inaccuracies in the furnished information that a reasonable investigation could have discovered."  *Hall v. LVNV Funding, LLC*, No. 6:16cv36, 2017 WL 6403049, at *3 (E.D. Tex. Aug. 11, 2017) (citation modified), *report and recommendation adopted*, No. 6:16-CV-36-RWS, 2017 WL 6403048 (E.D. Tex. Sept. 11, 2017), *aff'd*, 738 F. App'x 335 (5th Cir. 2018).  Accordingly, Plaintiff's claim under § 1681s-2(b)(1) is independent of § 1681s-2(a), and Pennymac's first ground for summary judgment fails.

**B.  *Whether There Is a Genuine Dispute That Pennymac Reported Inaccurate Information or Otherwise Failed to Conduct a Reasonable Investigation.***

To prevail on a § 1681s-2(b) claim, Plaintiff "must demonstrate actual inaccuracies in the furnished information that a reasonable investigation could have discovered." *Hall*, 2017 WL 6403049, at *3.  Absent a genuine dispute as to the accuracy of the furnished information, "a plaintiff's claim against a furnisher necessarily fails, as the plaintiff would be unable to demonstrate any injury from the allegedly deficient investigation." *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1313 (11th Cir. 2018).

Pennymac argues that it accurately reported both (1) Plaintiff's payment rating and history as a 6—"180 days or more past due date"—based on Plaintiff's defaulting on his mortgage on July 1, 2019, and his failure to cure the delinquency at any time before fully paying off the loan on July 26, 2021; and (2) Plaintiff's account status as "65"—"[p]aid in full; a foreclosure was started"— (*Id.* at 11–12.)  Plaintiff fails to raise a genuine issue of material fact as to either of these issues.

1.  *The July 1, 2019, Default and Payment Rating.*

In challenging his payment rating, Plaintiff argues that he did not default on July 1, 2019; that he did not breach the Pennymac Plan; and that his payment rating of 6 was inaccurate.  Each argument is addressed below.

a.  Default.

Plaintiff first contends that he did not default on his mortgage on July 1, 2019.  (Docket Entry 64, at 7.)  There is no genuine dispute on this issue.  Pennymac produced evidence demonstrating that Plaintiff failed to make his required mortgage payment, thereby defaulting on the loan on July 1, 2019;[4] Plaintiff has produced no evidence to the contrary.  Plaintiff points to

---

[4] That evidence includes, *inter alia*, Plaintiff's own deposition testimony that he failed to make his "July 1, 2019, monthly payment" (Docket Entry 63-2, at 8), and his response to

Pennymac's own records which, he argues, reflect his account to be current for July 2019. (*Id.*;

Docket Entry 64-3, at 4–14.)  But the materials cited confirm just the opposite—that Plaintiff's

account was 30 days past due by August of 2019, and 60 days past due by September of 2019.

(Docket Entry 64-3, at 5, 9, 14.)[5]   Indeed, Plaintiff agreed that his mortgage was in default as of

July 1, 2019, when he entered into the Pennymac Plan in September 2019.  (*See* Docket Entry 63-

2, at 26 ("For the purpose of this Plan, the following Terms and Conditions will apply: [y]our

account is presently due for July 01, 2019[;] [t]he amount outstanding is $5,054.93.").)  Because

a § 1681s-2(b) claim requires "actual inaccuracies in the furnished information," *Hall*, 2017 WL

6403049, at *3, Plaintiff's claims fail to the extent that they are predicated on Pennymac's failure

to discover and correct information regarding Plaintiff's defaulting on his loan in July of 2019.

> b.   Pennymac Plan.

Plaintiff does not dispute that that Pennymac granted him forbearance under the Pennymac

Plan on September 20, 2019.  (Docket Entry 64, at 6; *see* Docket Entry 63-2, at 26.)  Nor does he

dispute that terms of the Pennymac Plan required that he make six payments of $5 over the course

of six months, "starting on October 1, 2019, and terminating on March 31, 2020."  (Docket Entry

64, at 6; *see* Docket Entry 63-2, at 26.)  Plaintiff also agrees that the Pennymac Plan was terminated

by Pennymac on February 6, 2020, and that Pennymac's stated explanation for the termination

---

Pennymac's Request for Admission No. 7, wherein he "admits that the July 1, 2019 payment that
was due on the Loan was not paid until the loan was paid in full . . . . on July 26, 2021" (*id.* at 31).

[5] Plaintiff seems to rely on the fact that the records mark July 2019 as "on time"—while
August and September 2019 were "30 days late" and "60 days late," respectively. (Docket Entry
64, at 7; *see, e.g.*, Docket Entry 64-3, at 5, 9, 14.) But this does not support Plaintiff's position, as
credit reporting industry standards provide that "[t]he 'clock' for a 30-day delinquency starts 30
days *after* the due date," and that an account with a non-zero balance is considered current so long
as it is only "*0-29 days* past the due date." (Docket Entry 63-1, at 61, 64 (emphasis added).)

was: "Payment Plan Defaulted (Breach)."  (Docket Entry 64, at 7; Docket Entry 63-1, at 39.)

However, Plaintiff denies that he breached the Pennymac Plan by defaulting on his $5 monthly

payment obligations.[6]

Assuming that Plaintiff raises a genuine factual dispute on this issue, resolution of the

dispute is immaterial to whether Pennymac is entitled to summary judgment.  *See Wiley v. State*

*Farm Fire & Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009) ("A fact is material only if its resolution

would affect the outcome of the action.").  The Pennymac Plan clearly provided that, even if timely

made, the six payments of $5 would "not cure any default under [Plaintiff's] loan, unless the

payments [we]re sufficient to completely cure [his] entire default."  (Docket Entry 63-2, at 27.)

Plaintiff's "entire default" when he entered into the Pennymac Plan was $5,054.93.  (*Id.* at 26.)

Thus, assuming he made a timely payment of $30, it would not have "completely cure[d]" his

default—it would not have even brought his delinquent amount below $5,000.  (*See id.*)  Thus,

even if there is a genuine dispute as to whether Plaintiff made all of his Pennymac Plan payments

that dispute would not be material to his § 1681s-2(b) claim.

c.  Plaintiff's rating.

Finally, Plaintiff disputes Pennymac's categorizing his payment rating and payment history

as a 6—*i.e.*, "180 days or more past due."  (Docket Entry 63-1, at 52, 57, 62.)  According to

Plaintiff, Pennymac should have categorized these fields as "0," meaning "current," because he

---

[6] In its motion, Pennymac also argues that Plaintiff breached the Pennymac Plan by failing to confirm his employment status with Pennymac for the months of December 2019 and January 2020. (Docket Entry 63; *see* Docket Entry 63-2, at 27 ("Beginning with the first day of the month following the execution date of this Plan, you must verbally confirm your employment status each month during the Plan."); *id.* at 13 ("Q. Were you employed in December of 2019 . . . . [and] January of 2020? A. Yes.").) As this alleged breach was not Pennymac's stated explanation for terminating the Plan, this Report and Recommendation does not address it further.

"paid the full balance of his [Pennymac] [P]lan, *i.e.*, $40.00." (Docket Entry 64, at 9.)  But as the undersigned explained in the preceding subsection,  even if Plaintiff made $40 worth of payments during term of the Pennymac Plan, that amount was not "sufficient to completely cure [his] entire default." (*See* Docket Entry 63-2, at 26.)  Accordingly, Plaintiff's account was in default from July 1, 2019, until he sold the property on July 26, 2021, and paid off the full balance of the loan—*i.e.*, for "180 days or more." (*See* Docket Entry 63-1, at 31; Docket Entry 63-2, at 20–21, 51.)  And the Credit Reporting Resource Guide instructs furnishers to "[f]reeze the . . . [p]ayment [r]ating . . . [and] [p]ayment [h]istory . . . as of the date the account was paid." (Docket Entry 63-1, at 67.) The Guide further explains that the payment rating "identifies whether the account was current . . . [or] past due . . . *prior to the* [*account*] *status and within the current month's reporting period*." (*Id.* at 62.)[7]  And the payment history "[c]ontain[s] up to 24 months of consecutive payment activity for the previous 24 reporting periods." (*Id.* at 63.)  Thus, there is no genuine dispute that the pay rating and payment history profile were reported accurately—*i.e.*, that Plaintiff's account was "180 or more days past due" immediately prior to his paying off the full loan balance.

In sum, Plaintiff has not produced evidence sufficient to genuinely dispute whether Pennymac accurately reported Plaintiff's default, pay rating, and payment history.  While Plaintiff has produced sufficient evidence to genuinely dispute whether he breached the Pennymac Plan, the disputed fact is ultimately immaterial because it has no bearing on whether Pennymac

---

[7] To illustrate, the Guide explains that if an account "was paid on March 22, 2021, but the consumer was 30 days past the due date on March 10, 2021, prior to paying the account," the payment rating must be "1"—meaning "30-59 days past the due date." (Docket Entry 63-1, at 62.) Thus, district courts in the Ninth and Third Circuits have concluded that payment rating codes are "indicative  of the status of the paid or closed account while the account was still active." *Moulton v. Americredit Fin. Servs., Inc.*, No. C 04-02485 JW, 2006 WL 8459731, at *3 (N.D. Cal. Dec. 29, 2006); *accord Fernandez v. Great Lakes Educ. Loan Servs., Inc.*, No. CV 19-144, 2021 WL 3857864, at *4 (E.D. Pa. Aug. 30, 2021).

accurately reported Plaintiff's default, pay rating, or payment history. Accordingly, because a § 1681s-2(b) claim requires "actual inaccuracies in the furnished information," *Hall*, 2017 WL 6403049, at \*3, Pennymac is entitled to summary judgment on those of Plaintiff's § 1681s-2(b) claims predicated on inaccuracies as to Plaintiff's default, pay rating, and payment history.

2. *Plaintiff's "65" Account Status.*

Following the termination of the Pennymac Plan, Pennymac initiated foreclosure proceedings, with a sale scheduled for May 5, 2020. (Docket Entry 63-1, at 41–49.) As such, there is no basis in the record to genuinely dispute that foreclosure proceedings were initiated. (*See id.*) Thus, once Plaintiff sold the property and paid off the total balance of the loan, it was accurate for Pennymac to report his account as 65: "Paid in full; foreclosure was started." (*See* Docket Entry 63-1, at 6–9, 52–66.) *See Toliver v. Experian Info. Sols., Inc.*, 973 F. Supp. 2d 707, 718–19 (S.D. Tex. 2013) (granting summary judgment after determining that codes reported by defendant under CDIA's Credit Reporting Resources Guide were accurate). As a §1681s-2(b) claim requires "actual inaccuracies in the furnished information," *Hall*, 2017 WL 6403049, at \*3, Plaintiff's claims fail as a matter of law to the extent that they are predicated on Pennymac's failure to discover and correct information regarding his account status.

The CARES Forbearance does not affect the accuracy of Pennymac's report. The terms of that Forbearance required Pennymac to continue reporting Plaintiff's pre-Forbearance delinquencies, pursuant to § 1681s-2(a)(1)(F)(ii)(II)(aa). (*See* Docket Entry 64-3, at 27 ("Under the federal CARES Act, Penny[m]ac . . . must report your loan as delinquent on a forbearance plan if your loan was past due as of January 31[,] [2020].").) *See* 15 U.S.C. § 1681s-2(a)(1)(F)(i)(II), (ii)(I)–(II)(aa) ("[B]eginning on January 31, 2020 and ending [on August 8, 2023] . . . if a furnisher makes an accommodation . . . and the consumer . . . is not required to make [one] or more

13

payments pursuant to the accommodation, the furnisher shall . . . report the credit obligation or account as current . . . [unless] [it] was delinquent before the accommodation."). Thus, because Plaintiff's account was past due since July 1, 2019—and was not made current prior to either January 31, 2020, or when he received the CARES Forbearance on April 28, 2020—Pennymac was required to continue reporting his account as delinquent. And while Plaintiff managed to sell the property and fully pay off the loan balance prior to the expiration of his extended CARES Forbearance—bringing his account balance to "$0"—this does not support his argument that the loan was *current*, as a current account requires "a non-zero [b]alance." (Docket Entry 63-1, at 64.)

In sum, there is no genuine dispute that Pennymac accurately reported Plaintiff's account status. And because a § 1681s-2(b) claim requires "actual inaccuracies in the furnished information that a reasonable investigation could have discovered," *Hall*, 2017 WL 6403049, at *3, Plaintiff's claims fail as a matter of law.

## V.   Conclusion and Recommendation.

Based on the foregoing, I recommend that Pennymac's Motion for Summary Judgment (Docket Entry 63) be **GRANTED,** and Plaintiff's claims be **DISMISSED**.

## VI.   Notice of Right to Object.

The United States District Clerk shall serve a copy of this Report and Recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the Clerk of Court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested. Written objections to this Report and Recommendation must be

filed **within 14 days** after being served with a copy of the same, unless this time period is modified by the District Court.  28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).

The parties shall file any objections with the Clerk of the Court and serve the objections on all other parties.  An objecting party must specifically identify those findings, conclusions, or recommendations to which objections are being made and the basis for such objections; "objections that are frivolous, conclusory, or general in nature needn't be considered." *Williams v. Lakeview Loan Serv. LLC*, 694 F. Supp. 3d 874, 881 (S.D. Tex. 2023) (citing *Battle v. U.S. Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987)).

A party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation shall bar the party from a *de novo* review by the District Court.  *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985); *Acuña v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2000).  Additionally, failure to file timely written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to, proposed findings and conclusions accepted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

**SIGNED** on September 3, 2025.

Henry J. Bemporad
United States Magistrate Judge